LEARY et al. v. TALBOT et al.

(District Court, S. D. New York. February 11. 1907.)

SHIPPING—DEMURRAGE—LIABILITY OF CHARTERER FOR DELAY IN DISCHARGING.
The owners of a schooner *held* entitled to recover demurrage from a charterer for delay in discharging at New York, under a charter providing for customary dispatch, where the vessel was required by the charterer to discharge portions of the cargo at different docks, and the delay resulted from a miscalculation by the charterer as to the time which would be required at the first dock which threw her behind in reaching the others, and in consequence the berths reserved for her there were occupied by other vessels, and she was obliged to wait.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 576–582.]

In Admiralty. Suit against charterers for demurrage.

Brown & Boland, for libellants.
Henry W. Goodrich, for respondents.

ADAMS, District Judge. This is an action by the owners, Daniel J. Leary and others, to recover damages to the schooner Persis A. Colwell, alleged to be due by Chase, Talbot & Company for detention in unloading a cargo of lumber and lath in New York. The vessel came from Nova Scotia and arrived here on the 7th of October, 1905, and duly reported to the respondents. It is claimed by the libellants that she was ready at all times from the time of her reporting to deliver the cargo, but by reason of the neglect of the respondents to take it, was detained from the 4th of November till the night of the 25th of Novem-

ber, 1905, being 21 days at an agreed rate of $44. per day, amounting to $924.

After some admissions and denials of allegations in the libel, the respondents allege that the master of the vessel was not ready to deliver the cargo of the respondents until the 18th of October, and that the delay was not caused by any default of the respondents, who designated the Jersey Central Dock and the Erie Dock at Jersey City, the yard of John C. Orr & Company at Greenpoint, Brooklyn, and the dock of J. B. Tisdale, Pot Cove, Astoria, as places of delivery of the cargo. They further allege that they took all necessary steps in providing clear berths for the receipt of the cargo from the vessel, but that through the fault of the vessel and without any default on the part of the respondents, she was delayed as alleged in the delivery of her cargo.

The charter party was dated at New York on the 6th day of September, 1905, and provided for customary despatch in discharging. The schooner loaded lumber and lath in Nova Scotia, the former consigned to the respondents. She arrived at City Island in the Sound on the 7th of October and reported by telephone to the respondents. She then proceeded to New York, where she arrived on the 9th of October, and under orders proceeded to 109th Street, East River, reaching there the 10th about 12 o'clock but found no unoccupied berth and was not able to get one until Saturday, the 14th. The master who navigated the schooner from Nova Scotia, was on her up to this time and when she began discharging the same, but was then succeeded as master by his brother. The former was about to testify concerning the custom of its being the duty of the consignee of a vessel to furnish a berth for her discharge, when that fact was admitted upon the record.

He further testified, on cross examination, that the charter party was between him, as master, and Chase, Talbot & Company, while the bills of lading read that the lumber was consigned to that firm and the lath to the order of the Nova Scotia Lumber Company, Limited. The lath was discharged at 109th Street, in pursuance of instructions received from a Boston firm, who represented the consignee and purchaser of the lath under a bill of lading to order. At first it was unknown who was entitled to receive it, but the master, with the assistance of the respondents, ascertained that the Boston firm had arranged for the discharge at 109th Street. There was some dispute as to whether the master knew when he signed the lath bill of lading, for whom it was actually intended in view of the charter party with the respondents and if it appeared there was any delay in the discharging at 109th Street, it is probable that the respondents were liable therefor but the vessel now seems to have waived any claim therefor, at least does not strongly urge it, the amount being small, but relies upon the subsequent delays for which the respondents were actually responsible, if there were any. The claim is that the time was lost in getting berths and towing around.

The trouble seems to have arisen from what occurred at the New Jersey Central docks at Communipaw. As soon as the discharge of lath at 109th Street was completed, October 17th at 11 o'clock A. M., she proceeded under order of the respondents, who had been notified the previous day of the vessel's readiness to proceed, to the Communi-

paw Dock where she arrived at 1 o'clock P. M. of the same day and reported to the dock master. This was a railroad dock and the only discharge allowed there was on cars. There were no cars on the dock when the vessel arrived and none came till the next day, when they commenced discharging. The 18th and 19th they worked all day. In the morning of the 20th it rained and discharging went on in the afternoon. The 21st they worked all day. The 22nd was Sunday. On the 23rd they finished discharging the portion of the cargo that was to be taken off there. On the 22nd the master reported to the respondents that they would finish the next day and the respondents instructed him to go to Dock G of the Erie Railroad, which he did and left the New Jersey Central Dock at 6 A. M. the 24th and arrived at the Erie Dock at 7:15 A. M.

One of the respondents testified that upon receipt of the notification that the vessel would be ready to proceed with the delivery of lumber, the lath being out the 17th, they received a berth for the vessel at the New Jersey Central Dock and notified the master to proceed there. At the same time they followed the usual course of business and asked the freight agent of the railroad company if he would see that the cars were run down to the vessel as customary, which he said he would. The respondents claim, however, that it was not a part of their duty to attend to the cars getting there. This witness said that he thought the vessel had 75,000 feet for Communipaw, which would require at the usual rate of discharge, 25,000 per day, three days, or four at the outside, for the discharge there and acting upon that theory, they engaged the berth at Erie Dock G. The discharge at the New Jersey Central, however, took four and a half days, not through any fault upon the part of the vessel but from the weather or the trouble and time incident to the loading of the lumber in the box cars which were provided, and by the time the vessel reached the Erie dock, it was occupied by another vessel. She was unable to do any discharging because she could not get a berth until 2 o'clock P. M. the 26th. She worked that day, the 27th and the 28th. The 29th was Sunday. The 30th they worked all day, the 31st, November 1st and the 2nd till 3 P. M. On the 1st, the master notified the respondents of the situation and they ordered him to John C. Orr's dock at Greenpoint. Arriving there that evening, no berth was found. The discharging there was to be on the dock and nothing could at first be done because she was lying outside of other vessels, waiting for an opportunity to get to the dock. This situation continued during the 3rd and 4th. The 5th was Sunday. This continued during the 6th, 7th, 8th and 9th. On the 10th they began to discharge over another vessel at 3 o'clock in the afternoon. Before that time the intervening vessel would not allow the Colwell to discharge over her. From this time, however, the discharging proceeded as fast as the people ashore could take the lumber. On the 11th they worked all day over the other vessel and that evening reached the dock. The 12th was Sunday again. On the 13th they worked and during the 14th till 4 P. M. when the Orr part of the cargo was finished. The master had arranged for the services of a tug, which was awaiting the completion of the discharge, and immediately went to Tisdale's dock,

arriving there the evening of the 14th. He found a schooner discharging at the dock and a coal barge lying outside of her. He had to go therefore outside of the barge and so remained through the 15th, 16th, 17th, 18th, and 19th. The next day, the 20th, was Sunday. At 2 P. M. of the 21st they began working over the coal barge which was discharging coal. The Colwell worked all the remainder of that day and the next, the 21st. On the 22nd at 8 A. M., she hauled into the dock, the coal barge having finished, and they worked all that day, the 23rd, 24th and 25th up to 5:30 P. M., when the cargo was finished.

It is fairly established that the schooner, during the days she was discharging, put out all that was legally required of her. I find nothing in the testimony to justify her detention at the various places. The difficulty apparently arose, principally, from the respondents' errors in calculating, primarily at the Jersey Central Dock, the time the vessel would be discharging. An error having been made there by the respondents, every arrangement they made subsequently went awry but it does not seem that the vessel should suffer therefrom. I think she was entitled to recover demurrage for the time she did not work, viz: 1 day at the New Jersey Central, viz: October 23rd; 2½ days at the Erie, viz: October 24th, 25th and 26th ½; 6½ days at Orr's, viz: November 3rd, 4th, 6th, 7th, 8th, 9th and 10th ½ and 5½ days at Tisdale's, viz: November 15th, 16th, 17th, 18th, 19th and 21st ½.

There will be a decree for the libellants for 15½ days demurrage at the charter rate of $44 per day, $682.